**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

CLEMON HUDSON,

    Petitioner

v.

WILLIAM HUTCHING,[1] *et al*.,

    Respondents.

Case No.: 2:22-cv-01377-GMN-BNW

**Order Denying Petition, Denying Certificate of Appealability and Closing Case**

In his 28 U.S.C. § 2254 Habeas Corpus Petition, Clemon Hudson challenges his burglary, battery, and attempted murder convictions, including arguing that his trial should have been severed and that the prosecutors engaged in misconduct. (ECF No. 5.)  The Court has considered the merits of the Petition, and it is denied.

I.    **Background**

In April 2018, a Nevada (Clark County) jury convicted Hudson of two counts of Attempted Murder with Deadly Weapon, Conspiracy to Commit Burglary, Attempted

---

[1] According to the Nevada Department of Corrections inmate locator page, Hudson is incarcerated at Southern Desert Correctional Center. The department's website reflects Ronald Oliver is the warden for that facility. At the end of this order, the Court directs the Clerk to substitute Ronald Oliver for prior respondent William Hutching, under, *inter alia*, Rule 25(d) of the Federal Rules of Civil Procedure.

Burglary while in Possession of a Firearm or Deadly Weapon, and Battery with Use of a Deadly Weapon Resulting in Substantial Bodily Harm. (Exh. 54.)[2]  Hudson and Steven Turner were convicted of trying to break into a Las Vegas house to steal marijuana and shooting at responding police officers, seriously injuring one. (See ECF No. 22 at 2.) The state district court sentenced Hudson to an aggregate term of 168 to 480 months. (Exh. 58.)  Judgment of conviction was entered on July 2, 2018. (Exh. 59.)  Hudson's trial counsel did not file an appeal.  Hudson filed a state postconviction petition through new counsel that challenged, in part, his trial counsel's failure to file an appeal. (Exh. 61.)  After an evidentiary hearing, the district court found that Hudson was deprived of his right to a direct appeal and granted him relief on that claim. (ECF Nos. 71, 72.)  The court denied the remaining claims. (ECF No. 72.)  The Nevada Court of Appeals affirmed the denial of his state postconviction petition in June 2022. (Exh. 90.)

Hudson dispatched his federal Petition for mailing about August, 2022. (ECF No. 5.) He raises six grounds:

> Ground 1: The district court abused its discretion by not granting Hudson's motion to sever defendants.
>
> Ground 2: The prosecutor committed misconduct at trial such that the conviction must be reversed.
>
> Ground 3: The district court erred by giving improper jury instructions.
>
> Ground 4: The district court erred by allowing uniformed officers to pack the courtroom.
>
> Ground 5: Cumulative error in trial proceedings.

---

[2] Exhibits referenced in this Order are found at ECF Nos. 18-19.

Ground 6: Hudson's trial counsel was ineffective for failing to object to the jury instruction on flight.

(ECF Nos. 5, 1-2.)

Respondents have answered the Petition. (ECF No. 22.)  Hudson did not file a reply or respond to the answer in any way.

## II.    Trial Testimony

The Court summarizes trial evidence and related state-court record material and proceedings as a backdrop to its consideration of the issues presented in the case.[3] Eric Clarkson testified that he and Steven Turner had been friends and would smoke marijuana frequently at Clarkson's house. (Exh. 44 at 58-91; Exh. 45 at 65-69.)  At some point Clarkson and Turner had stopped communicating; they hadn't been in touch for almost a year before the incident.  Clarkson's best friend, Willoughby Potter de Grimaldi also lived at the house.  On the night in question, September 4, 2015, Clarkson was getting ready to go to bed at about 3:30 in the morning.  A few minutes after he turned off his bedroom light, he heard a sound that he recognized as a chair on his patio being moved across the bricks.  He looked out his window and saw a young, black man on the patio.  He grabbed his phone, woke up his roommate, and called 911 to report that someone was in his backyard.  Grimaldi went to the front window and saw someone outside the front door.  Two police officers arrived, Robertson and Grego-

---

[3] The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court record.  The Court summarizes the same solely as background to the issues presented in this case, and it does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court.  Any absence of mention of a specific piece of evidence or category of evidence does not signify the Court overlooked it in considering Hudson's claims.

Smith; Clarkson let them in the front door.  He and Grimaldi showed them that someone was in the backyard and how to turn on the back lights and open the back door.  When Officer Robertson opened the back door, Clarkson saw two bullets fly across the living room very close to Clarkson from outside the back door.  The two roommates hid in a bedroom while shots were exchanged.  At some point later he saw Turner's picture on the news; he contacted detectives and said that he knew that man.

Grimaldi testified that on the night in question he was just falling asleep when Clarkson woke him up. (Exh. 44 at 91-128.)  He went to a back window and saw a black man wearing a billed cap cocking what looked like a shotgun.  Someone started banging on the front door; he peeked out the window and saw a different individual at the front door.  The person had an afro, was about 6'1" and was shirtless with black basketball shorts.  Grimaldi looked out a back window and thought he saw a third individual.  He thought he saw someone running away from the house just before police arrived.  The moment police opened the back door, shots were fired into the house.  Grimaldi said he was familiar with the difference between different bullets, and one bullet came from a shotgun and one from a "straight-shooting" firearm.

Las Vegas Metropolitan Police Department ("LVMPD") Officer Malik Grego-Smith testified that he and Officer Jeremy Robertson responded to a call about a prowler. (Exh. 46 at 56-100.)  When they approached the house, Smith heard someone in the backyard.  The residents opened the front door, and the officers went in the house toward the backyard.  Robertson opened the back door, Smith started to take a step outside the door when two shots were fired from a high-powered rifle.  Smith took a step back behind cover and returned fire; he glimpsed a back man, shirtless, in purple

1  basketball shorts.  He also heard Robertson fall to the ground behind him.  Smith

2  reported officer down.  Robertson reported over the radio that he had seen two

3  suspects.  Later when the K-9 unit apprehended Hudson, Smith kept watch to see that

4  no one else was in the backyard.

5        Officer Jeremy Robertson testified that he and Smith responded to the prowler

6  call. (Exh. 46 at 102-135.)  When they went to the back of the house, they couldn't see

7  anyone in the backyard from the windows.  The officers decided to clear the backyard.

8  He holstered his gun to open the backdoor so that Smith could go out the door.

9  Robertson was immediately shot in the leg from the backyard.  Smith took a knee in

10  front of Robertson to protect him, radioed officer down, and was firing into the backyard.

11  Robertson knew that he told Smith there were two suspects, though he does not

12  remember anything that he saw.  Responding officers pulled Robertson from the house

13  and he went by ambulance to the hospital.  His femur was shattered, surgeons installed

14  a titanium rod, and his gluteus muscles and hip flexor muscle had to be reattached.

15        LVMPD K-9 Sergeant Joshua Bitsko testified that he is the handler for police dog

16  Loki. (Exh. 45 at 127-152.)  He responded to the scene and organized his team to

17  apprehend the suspect who was still in the backyard.  They moved through the house

18  toward the backyard; it was very dark, and Bitsko could not see anyone in the backyard.

19  An officer gave verbal commands to the suspect to put up his hands and crawl towards

20  the house.  The suspect responded but the officers couldn't understand what he said.

21  An air unit overhead communicated that the suspect was down on the ground, next to

22  him was a long gun.  Bitsko deployed Loki, who bit the suspect on the wrist and began

23

to pull him toward the house.  Bitsko could then see that the suspect didn't have a gun in his hands, so the team moved in to arrest the individual, Hudson.

Fingerprints recovered from the shotgun were later identified as Hudson's. (Exh. 47 at 11-29.)  A DNA profile obtained from a beanie that was in the backyard as well as other DNA found at the scene was consistent with Hudson. (Exh. 47 at 29-53.)  Turner was excluded as a possible contributor.

LVMPD detective Jeremy Vance testified that he apprehended Turner in a neighborhood about half a mile away. (Exh. 45 at 153-165.)  Turner initially gave him a fictitious name.  When the officers asked Turner about his bloody leg, he said he hurt it hopping over a friend's fence.  From Vance's experience, it looked like a gun shot wound.  Turner was arrested and taken to the hospital for treatment for a gun shot wound. (Exh. 50 at 8-9.)  Surveillance video recovered by officers showed Turner crossing yards, parking lots, and fences on foot immediately after the incident.

**III.     AEDPA Legal Standard and Analysis**

28 U.S.C. § 2254(d), a provision of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), provides the legal standards for this Court's consideration of the Petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

1     The AEDPA "modified a federal habeas court's role in reviewing state prisoner

2  applications in order to prevent federal habeas 'retrials' and to ensure that state-court

3  convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S.

4  685, 693-694 (2002).  This Court's ability to grant a writ is limited to cases where "there

5  is no possibility fair-minded jurists could disagree that the state court's decision conflicts

6  with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  The

7  Supreme Court has emphasized "that even a strong case for relief does not mean the

8  state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538

9  U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing

10  the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating

11  state-court rulings, which demands that state-court decisions be given the benefit of the

12  doubt") (internal quotation marks and citations omitted).

13     A state court decision is contrary to clearly established Supreme Court precedent,

14  within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts

15  the governing law set forth in [the Supreme Court's] cases" or "if the state court

16  confronts a set of facts that are materially indistinguishable from a decision of [the

17  Supreme Court] and nevertheless arrives at a result different from [the Supreme

18  Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362,

19  405-06 (2000), and citing *Bell*, 535 U.S. at 694.

20     A state court decision is an unreasonable application of clearly established Supreme

21  Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies

22  the correct governing legal principle from [the Supreme Court's] decisions but

23  unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538

U.S. at 74 (quoting *Williams*, 529 U.S. at 413).  The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004).  This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.*  The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973.  Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.  The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Cullen*, 563 U.S. at 181.

**Ground 1**

Hudson alleges that the district court abused its discretion by not granting his motion to sever defendants. (ECF No. 5-1 at 8-17.)  He argues that there was not a way to redact Turner's statements enough to not implicate Hudson, and that Turner's

statements constituted a *Bruton* violation.[4]  He asserts that he was deprived of his Sixth

Amendment right to confrontation because Turner's statements were admitted and

Turner didn't testify, so Hudson couldn't cross examine him.  He also argues that his

defense was antagonistic to Turner's and that Turner's statement implicated Hudson for

the attempted murder.

A district court should only grant a severance "if there is a serious risk that a joint

trial would compromise a specific trial right of one of the defendants, or prevent the jury

from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506

U.S. 534, 539 (1993).  Consolidation rests in the sound discretion of the state trial

judge, and simultaneous trial of multiple offenses must actually render the state trial

fundamentally unfair and therefore violative of due process before federal relief is

available. *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991).  Policy benefits

of consolidated prosecutions also serve to "conserve state funds, diminish

inconvenience to witnesses and public authorities, and avoid delays in bringing those

accused of crime to trial." *Bruton v. United States*, 391 U.S. 123, 134 (1968).

Here, the officers who testified about Hudson and Turner's statements to them

were cautioned not to refer to the co-defendant when testifying about the other's

statements. (Exh. 47 at 55-58.)  They also had the redacted statements to refer to

during their testimony.  The State did not play Hudson's or Turner's statement to the

jury because they were heavily redacted; the State had removed specific references by

---

[4] *See Bruton v. United States*, 391 U.S. 123 (1968) (holding that a defendant is deprived of his rights under the Confrontation Clause when his non-testifying codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant).

1  each co-defendant to the other.  Craig Jex, a LVMPD Force Investigation Team ("FIT")

2  detective, testified that FIT investigates officer-involved shootings and that he

3  interviewed Hudson after his arrest. (Exh. 47 at 58-95.)  Jex testified that Hudson told

4  him that he and another individual went to the house that night to steal marijuana.  They

5  drove to the house in Hudson's mother's Toyota Camry.[5]  The person that Hudson went

6  to the house with knew the homeowner and had said that it would be easy to steal

7  marijuana from the house.  They had expected the door to be unlocked and the house

8  to be empty, but the doors were locked.  They knocked on the front door; it appeared no

9  one was home.  Hudson was carrying a shotgun and said that the plan was to break the

10  back window.  He said he had been wearing a long sleeve camouflage shirt and a

11  beanie.  Hudson said that when the police opened fire on them, he may have fired the

12  shotgun once toward the bottom of the back window, then he fell backwards over a

13  small wall in the backyard.  He stayed behind the wall during the remainder of the

14  shooting.  He told Jex that he didn't initially know the shooters were police officers.  He

15  thought the officers started shooting first and were shooting through the door.  Hudson

16  said this was the first "heist" he'd ever been involved in.

17       LVMPD officer Eduardo Pazos testified that he interviewed Steven Turner. (Exh.

18  47 at 95-125.)  When officers approached Turner, who was on foot several blocks from

19  the crime scene, he initially told the officer that his name was Devonte Turner.  Turner

20  told Pazos that someone had called him to go for a ride.  When Turner got in the car, he

21  saw two guns in the back.  Turner specifically said that it was just he and one other

22

23  [5] A detective testified that the Toyota Camry registered to Karen Hudson was parked near the house and officers found with Turner's two dogs and cell phone inside. (Exh. 48 at 26-27.)

individual; no one else was in the car.  They drove to the house of someone Turner

knew who sold marijuana.  When they got to the house, the other person hopped over

the wall first into the backyard, then Turner hopped over the wall.  He said someone

starting shooting from the house almost immediately; he said he hopped back over the

wall and fled.  Turner maintained that he did not shoot at anyone.

      The Nevada Court of Appeals rejected Hudson's claims that his confrontation

rights were violated this claim:

> … Turner's statements did not facially incriminate Hudson. Rather, Turner's statements were only incriminating when linked to other evidence presented at trial. Hudson's DNA and fingerprints were found on the baseball cap and shotgun recovered from Clarkson's backyard. His DNA was also found on Clarkson's patio. Hudson himself confessed to going to Clarkson's house to steal marijuana, carrying a shotgun and a handgun, and firing the shotgun at least once. As such, there was no *Bruton* violation, and any prejudice against Hudson caused by admitting Turner's statements was minimal. Further, this prejudice was likely cured by the limiting instructions the district court gave alongside each admitted statement. …

> …Hudson's and Turner's defenses were not "mutually exclusive" so as to require severance. At closing arguments, Turner argued the State had failed to prove that he was on Clarkson's patio or that he had a gun. He further argued the State could not prove there were only two people involved but rather that "there were likely four people involved." On the other hand, even though Hudson did not testify, he argued that he merely intended to go to an empty house to steal some marijuana. Hudson continued that once the gunfire started, he froze in fear because he did not "have murder on the brain" and did not "sign up for a gun fight." He argued it was not his intent to kill anyone and that there was "just no motive to do so."

> These defenses were not mutually exclusive because the jury could have accepted either while still acquitting the other defendant. In other words, the jury could have accepted both defenses and acquitted both defendants. Indeed, had the jury accepted Turner's argument that more individuals were involved, it would arguably have been more likely to acquit Hudson as well. On appeal, Hudson acknowledges this case does not present "a typical 'whodunnit' where two defendants pointed fingers at each other and tried to escape criminal liability altogether." Rather, both

defendants admitted they were at Clarkson's house, near the patio, at the time of the crimes, and that they had arrived there together. Each then pursued separate defenses to avoid criminal liability for the attempted murder charges. The district court therefore did not abuse its discretion in denying Hudson's motion to sever based on either *Bruton* or the codefendants' separate defenses.

Finally, we consider Hudson's own statements to determine whether a *Bruton* violation, if any, was harmless. Here, Hudson admitted to going to Clarkson's home to steal marijuana. He admitted to carrying the shotgun and a small handgun. And he admitted to firing the shotgun at least once "at the bottom of the window" of the home moments after the sliding backdoor was opened. These statements are more incriminating than Turner's statements that "someone came to pick him up," and "the person he was with hopped over the wall first." Therefore, any *Bruton* error was harmless considering Hudson's own confession.

(Exh. 90 at 8-10.)

Hudson argues that Turner's statement implicates Hudson in the attempted murder and that he would not have been found guilty of attempted murder without Turner's statement. But sufficient evidence supported Hudson's conviction. In his own statement he admitted to going to the house to steal drugs and that he fired the shotgun toward the bottom of a back window. He was apprehended at the scene, with a shotgun close by him. His DNA was found at the scene and on the shotgun. The Court is unpersuaded that a *Bruton* violation occurred. And any error was harmless. Hudson cannot demonstrate that the Nevada Court of Appeals' decision on federal ground 1 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Habeas relief on ground 1 is, therefore, denied.

**Ground 2**

Hudson contends that the State's prosecutorial misconduct during closing arguments warrants the reversal of his conviction. Prosecutorial misconduct may "'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Greer v. Miller*, 483 U.S. 756, 765 (1987), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). The court reviews under the "narrow" standard of a due process violation, "not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). A petitioner cannot prevail on such a claim by merely showing "that the prosecutors' remarks were undesirable or even universally condemned." *Id*. To constitute a due process violation, the prosecutorial misconduct must be "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Greer*, 483 U.S. at 765, quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985). "Prosecutorial misconduct which rises to the level of a due process violation may provide the grounds for granting a habeas petition only if that misconduct is deemed prejudicial under the 'harmless error' test." *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004). An error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abramson*, 507 U.S. 619, 623 (1993).

During closing argument, the prosecutor stated: "If I were to tell you [about the incident] over a glass of whiskey, you would look at me and go, Good. I'm glad you caught the two guys who shot the cops." (Exh. 50 at 112.) He also said, "Now, they could have been charged with four counts of attempt murder based on the transferred intent instruction. They could have been—we could have charged them with four

counts." (*Id.* at 122.)  The trial court sustained the defense objection to the second

statement.

The Nevada Court of Appeals agreed that the prosecutor committed misconduct

with both statements but held that neither comment so infected the trial with unfairness

to warrant reversal:

> Here, the prosecutor committed misconduct by inviting the jury to consider issues not in evidence when he said the State could have charged Hudson with additional crimes, thereby implying the prosecutor believed Hudson to be guilty of additional, uncharged crimes. *See Pantano v. State*, 122 Nev. 782, 793, 138 P.3d 477. 484 (2006) (holding that it is "always improper" for the prosecutor to give a personal opinion regarding a defendant's guilt); *see also Valdez*, 124 Nev. at 1192, 196 P.3d at 478 (recognizing that the prosecutor must "not inject [its] personal opinion or beliefs" into the trial); *Turner v. State*, 136 Nev. 545, 556, 473 P.3d 438, 449 (2020) (concluding it was misconduct for the prosecutor to reference the possibility of additional, uncharged crimes). However, the district court sustained Hudson's objection to this comment and instructed the jury to disregard it. *See Rose v. State*, 123 Nev. 194, 209, 163 P.3d 408, 418 (2007) (concluding the district court's admonishment was sufficient to cure any prejudice caused by a prosecutor's improper comment); *Summers v. State*, 122 Nev. 1326, 1333, 148 P.3d 778, 783 (2006) ("[T]his court generally presumes that juries follow district court orders and instructions."). Further, the evidence—including Hudson's confession to firing the shotgun at the house moments after the sliding backdoor was opened—strongly inculpated Hudson. *See Valdez*, 124 Nev. at 1195, 196 P.3d at 480 ("This error . . . did not infect the trial with unfairness so as to affect the verdict and deny [appellant] his constitutional right to a fair trial."). Therefore, this misconduct does not warrant reversal of Hudson's conviction.

> The prosecutor also committed misconduct by inviting the jurors to feel "good" about convicting a defendant who shot a police officer. *See Pantano*, 122 Nev. at 793, 138 P.3d at 484 (holding that it is improper to "appeal[ ] to juror sympathies by diverting their attention from evidence relevant to the elements necessary to sustain a conviction"); *see also Turner*, 136 Nev. at 556, 473 P.3d at 449 (concluding that it was misconduct to invite the jury to feel good about convicting defendants who shoot police officers). However, Hudson did not object to this comment, and we therefore review it for plain error. *See Valdez*, 124 Nev. at 1190, 196 P.3d at 477. Under plain error review, Hudson has not demonstrated his substantial rights were affected by the prosecutor's comment. *See*

*Jeremias*, 134 Nev. at 50, 412 P.3d at 48. Although improper, two fleeting comments made near the end of a ten-day trial do not warrant the reversal of a conviction that was otherwise supported by strong evidence implicating Hudson. [FN]

[FN: Hudson did not object below to the prosecutor's comment stating it did not matter that Turner and Hudson might not have known who they were shooting at so long as they attempted to kill two human beings. Even assuming arguendo that the prosecutor's statement constituted misconduct, Hudson has not demonstrated how that statement impacted his substantial rights to a fair trial. *See Jeremias*, 134 Nev. at 50, 412 P.3d at 48. Therefore, the alleged misconduct would not warrant reversal of Hudson's conviction.]

 (Exh. 90 at 17-18.)

The prosecutor's statements were clearly improper.  But, as discussed earlier, strong evidence supported Hudson's conviction, including that Hudson was apprehended at the scene and his DNA was found on the shotgun and Hudson's own statement that he shot at the house when the back door was opened.  The prosecutorial misconduct cannot be said to have had a substantial injurious effect on the jury's decision.  Hudson cannot demonstrate that the Nevada Court of Appeals' decision on federal ground 2 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).  Habeas relief on ground 2 is, therefore, denied.

**Ground 3**

Hudson asserts that the trial court erred by giving four improper jury instructions. (ECF No. 5.)  Issues relating to jury instructions are not cognizable in federal habeas review unless they infect the entire trial and establish a due process violation. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Cupp*

1  *v. Naughten*, 414 U.S. 141, 147 (1973).  Demonstrating that an erroneous instruction

2  was so prejudicial that it will support a collateral attack on the constitutional validity of a

3  state court's judgment requires the court to determine "whether the ailing instruction by

4  itself so infected the entire trial that the resulting conviction violates due process," not

5  whether the instruction is "undesirable, erroneous, or even universally condemned."

6  *Henderson*, 431 U.S. at 154 (citations omitted); *Estelle*, 502 U.S. at 72.

7          This Court evaluates whether there is a reasonable likelihood that the jury

8  applied the instruction in a way that violated the Constitution. *Estelle*, 502 U.S. at 72.

9  That a juror "could have" misinterpreted an instruction is different from the reasonable

10  likelihood that the juror did misinterpret the instruction. *Tyler v. Cain*, 533 U.S. 656, 658

11  n.1 (2001).

12          In reviewing jury instructions, the court inquires as to whether the instructions as

13  a whole are misleading or inadequate to guide the jury's deliberation. *United States v.*

14  *Garcia-Rivera*, 353 F.3d 788, 792 (9th Cir. 2003) (citation omitted).  An instruction may

15  not be judged in isolation, "but must be considered in the context of the instructions as a

16  whole and the trial record." *Estelle*, 502 U.S. at 72.  And jurors are presumed to follow

17  the instructions that they are given. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

18  Even if instructional error is found, the court must apply harmless error. *Calderon v.*

19  *Coleman*, 525 U.S. 141, 146 (1998) (per curiam), citing *Brecht v. Abrahamson*, 507 U.S.

20  619, 637-38 (1993).  The question is whether the instructional error "had a substantial

21  and injurious effect or influence in determining the jury's verdict." *Id*.

22

23

Hudson argued that the court erroneously gave the jury an instruction on transferred intent. (ECF No. 5-1 at 19-20.) The court gave the jury the following instruction:

Jury Instruction No. 29 (transferred intent)

During an attack upon a group, a defendant's intent to kill need not be directed at any one individual. It is enough if the intent to kill is directed at the group. The State is not required to prove that a Defendant intended to kill a specific person in the group.

(Exh. 52 at 33, ECF No. 19-2.)

The instruction is derived from *Ewell v. State*, 785 P.2d 1028 (Nev. 1989); Hudson asserts that *Ewell* is distinguishable from the facts of his case because there the defendant shot at a group of officers, while Hudson only went to the home with the intent to burglarize the home and steal marijuana, not the intent to kill. (*Id*. at 20.)

The appellate court held that the transferred intent instruction correctly stated Nevada law:

. . . . Hudson argues the district court erred in giving, over his objection, jury instruction number 29 because the facts of his case are dissimilar to the facts of *Ewell v. State*,[FN4] from which the instruction is derived. The State counters that *Ewell* stands for the proposition that the prosecution is not required to prove a defendant intended to kill a specific member of a group when he fired at the group. The State argues that it is irrelevant whether the "group" in this case was comprised of Officers Richardson and Grego-Smith in the doorway of Clarkson's home or of the officers in addition to Grimaldi and Clarkson. . . .

Here, like the jury instruction in *Ewell*, the jury instruction given by the district court "merely inform[ed] the jury that the state did not have to prove that [Hudson] intended to kill a specific person in the group" that he fired upon to be found guilty of attempted murder. *See Ewell*, 105 Nev. at 899, 785 P.2d at 1029. This accurately and fairly states Nevada law. *Id*. In addition, Hudson admitted to firing the shotgun at the house. Furthermore, Clarkson testified that he was close enough to the back door to see the bullets "fly across [his] living room." The district court relied on this evidence in allowing the jury instruction. A "group" is defined as "a number

of individuals assembled together or having some unifying relationship."
*See* Group, Merriam-Webster's Collegiate Dictionary (11th ed. 2007).
Therefore, Hudson fired into a group of either the two police officers or the
two police officers plus Grimaldi and Clarkson. As such, jury instruction
number 29 was correct under the law and the district court's decision to
give the instruction was not arbitrary or capricious and therefore did not
constitute an abuse of discretion. *See Jackson*, 117 Nev. at 120, 17 P.3d
at 1000.

[FN4: 105 Nev. 897, 785 P.2d 1028 (Nev. 1989)]

(Exh. 90 at 10-11.)

Respondents argue that Jury Instruction Nos. 28[6] and 29, when read together,
instruct the jury about the legal doctrine of transferred intent. Hudson does not argue
that it incorrectly states the law on transferred intent. Instead, Hudson argues that the
court should not have given the jury the instruction because the facts of his case differ
from the facts in *Ewell*. (ECF No. 5-1 at 20.) But Hudson's initial intent when he went to
the house is not the issue. The instructions instead explain that, once the intent to kill is
formed, the doctrine of transferred intent does not require the State to prove an intent to
kill a specific individual when shooting at a group. So Hudson's challenge to the
transferred intent instruction lacks merit.

Hudson did not object to the next three jury instructions that he challenged on
direct appeal. The Nevada Supreme Court thus reviewed the instructions for plain error.
(Exh. 90 at 12.) First, Hudson challenged the flight instruction because he did not flee

---

[6] Jury Instruction No. 28:

> If you believe that at the time of the shooting in this case a defendant intended to
> kill any person, or to aid and abet his co-defendant with the deliberate intention to
> unlawfully kill any person, it is of no legal consequence that he or his co-
> defendant mistakenly injured a different person. His intent to kill transfers to the
> person actually harmed.

the scene of the crime. (ECF No. 5-1 at 20-21.)  He insists that the court should have

instructed the jury that the instruction only applied to Turner.  The court instructed:

>    Jury Instruction No. 38 (flight)

>    The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in light of all other proved facts in deciding the question of his guilt or innocence. The essence of flight embodies the idea of deliberately going away with consciousness of guilt and for the purpose of avoiding apprehension or prosecution. Whether or not evidence of flight shows a consciousness of guilt and the significance to be attached to such a circumstance are matters for your deliberation.

>    (Exh. 52 at 42.)

The Nevada Court of Appeals held that because Hudson never left the scene,

the jury couldn't have mistakenly applied the instruction to Hudson:

>    Hudson has not demonstrated there was any error because he never left the scene and therefore there was no "going away that could have been misconstrued by the jury as flight to begin with. In other words, the district court's flight instruction was inapplicable to Hudson altogether. Hudson has cited no legal authority, nor has he cogently argued why it was plain error for the district court to give the flight instruction—which applied to his codefendant—without a limiting instruction. In the absence of legal authority indicating otherwise, any error on the district court's part in giving the flight instruction was not clear under current law from a casual inspection of the record.

>    Nevertheless, even assuming arguendo that the district court committed plain error by giving the flight instruction to the jury without a limiting instruction, Hudson has not demonstrated that any such error affected his substantial rights. The testimony given at trial made clear that, rather than flee, Hudson remained at and was apprehended at the scene. Turner, on the other hand, fled the scene and was only apprehended after a three-and-a-half-hour search. Hudson has not pointed to anything in the record that might suggest the jury would mistakenly apply the flight instruction to him. Indeed, the jury could not have done so because there was no "going away" on Hudson's part that might have been misinterpreted as flight. Therefore, even if the district court had committed plain error in giving a flight instruction that did not apply to Hudson, without

a limiting instruction, such error was neither prejudicial nor did it cause a "grossly unfair" outcome. *See Jeremias*, 134 Nev. at 51, 412 P.3d at 49.

(Exh. 90 at 13-14.)

Hudson is correct that the flight instruction clearly did not apply to him and only applied to Turner.  Trial testimony was clear that Hudson dropped his guns and laid down on the ground, where he was arrested.  Testimony also showed that officers arrested Turner blocks away as he walked toward a friend's house and that Turner initially gave police a fake name.  This Court agrees that there was no error, but any error would be harmless.  Hudson cannot show a reasonable likelihood that the jury applied the instruction in a way that violated the Constitution. *See Estelle*, 502 U.S. at 72.

Finally, Hudson contends that instruction nos. 40 and 50 on reasonable doubt and equal and exact justice were improper. (ECF No. 5-1 at 22.)  His brief argument is that the wording of the instructions minimized the State's burden of proof and violated his due process rights because the State is required to prove every element against a defendant beyond a reasonable doubt.

The court instructed as follows:

Jury Instruction No. 40 (reasonable doubt)

The Defendant is presumed innocent unless the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every element of the crime charged and that the Defendant is the person who committed the offense.

A reasonable doubt is one based on reason. It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a

reasonable doubt. Doubt to be reasonable must be actual, not mere possibility or speculation.

If you have a reasonable doubt as to the guilt of the Defendant, he is entitled to a verdict of not guilty.

(Exh. 52 at 44.)

The State counters that Hudson failed to support his allegations that the two instructions violate due process violation whatsoever. (ECF No. 22 at 16-17.)

The Nevada Court of Appeals pointed out that the language of the reasonable doubt instruction is prescribed by statute:

Here, the district court gave Nevada's statutory reasonable doubt instruction as set forth and mandated by NRS 175.211. The instruction explicitly stated Hudson was presumed innocent until proven guilty. Additionally, the jury instructions made clear that the State bore the burden of proving Hudson guilty. The supreme court has upheld this precise reasonable doubt instruction on multiple occasions. *See, e.g., Belcher v. State*, 136 Nev. 261, 276, 464 P.3d 1013, 1029 (2020) ("[W]e have repeatedly upheld the constitutionality of [the reasonable doubt] instruction."). Therefore, the district court did not err in giving the reasonable doubt jury instruction, plainly or otherwise.

(Exh. 52 at 14-15.)

The reasonable doubt instruction comes verbatim from NRS 175.211, which also prohibits any other definition of reasonable doubt from being presented to a jury. NRS 175.211(2). *See Belcher*, 464 P.3d at 1029; *see also Ramirez v. Hatcher*, 136 F.3d 1209, 1211-15 (9th Cir. 1998) (concluding that Nevada's reasonable-doubt instruction is constitutional). Hudson's claim is wholly unsupported and also lacks merit.

The court also instructed the jury:

Jury Instruction No. 50 (equal and exact justice)

Now you will listen to the arguments of counsel who will endeavor to aid you to reach a proper verdict by refreshing in your minds the evidence and by showing the application thereof to the law; but, whatever

counsel may say, you will bear in mind that it is your duty to be governed in your deliberation by the evidence as you understand it and remember it to be and by the law as given to you in these instructions, with the sole, fixed and steadfast purpose of doing equal and exact justice between the Defendant and the State of Nevada.

(Exh. 52 at 54.)

The Court of Appeals disagreed that the instruction was improper:

Finally, Hudson argues the district court's "equal and exact justice" instruction improperly minimized the prosecution's burden of proof. The State counters that the district court's "equal and exact justice" instruction did not deal with the presumption of innocence at all. It further argues that the jury instructions explaining the presumption of innocence correctly stated Nevada law.

Here, the district court gave a jury instruction specifically stating Hudson was presumed innocent unless proven guilty. It also gave multiple instructions making clear that the jury was required to find Hudson guilty beyond a reasonable doubt. The jury instructions also made clear that the State bore the burden of proving Hudson guilty. The supreme court has upheld this "equal and exact justice" instruction on multiple occasions. *See, e.g., Belcher*, 136 Nev. at 276, 464 P.3d at 1029 ("This court has upheld the language used in the . . . equal and exact justice instruction." (internal citations omitted)). Therefore, the district court did not err in giving the equal and exact justice jury instruction, plainly or otherwise.

(Exh. 90 at 15-16.)

The state courts have found this jury instruction does not concern presumption of innocence or burden of proof. *Belcher*, 464 P.3d at 1029 citing *Leonard v State*, 114 Nev. 1196, 1209, 969 P.2d 288, 296 (1998). The jury was also instructed on reasonable doubt and the presumption of innocence. While the phrase "equal and exact justice" does appear to be unusual, Hudson has not shown that the instruction conflicts with clearly established federal law. Hudson's claim is unsupported and therefore lacks merit.

1      Hudson has not shown that the Nevada Court of Appeals' decision that the four

2  jury instructions accurately stated the law and were properly given was contrary to, or

3  involved an unreasonable application of, clearly established U.S. Supreme Court law, or

4  was based on an unreasonable determination of the facts in light of the evidence

5  presented in the state court proceeding. 28 U.S.C. § 2254(d).  The Court, therefore,

6  denies habeas relief on ground 3.

7      **Ground 4**

8      Hudson claims that the district court erred by allowing uniformed police officers to

9  attend closing arguments. (ECF No. 5-1 at 22-23.)  He argues that officers in full

10  uniform would have intimidated the jury and affected their impartiality, rendering the

11  proceedings fundamentally unfair.

12      Right before closing arguments, counsel for Turner stated that it was his

13  understanding that a lot of law enforcement were going to attend closing arguments.

14  (ECF No. 50 at 40-42.)  Defense counsel acknowledged that it was an open, public

15  courtroom but argued that "the idea that numerous, numerous officers are going to

16  come into this gallery and stare at this jury immediately before a case involving an . . .

17  officer that was shot goes to the jury is extremely prejudicial." (*Id*. at 40.)  Counsel for

18  Hudson joined in the objection, stating that it was a "huge intimidation factor." (*Id*. at 42.)

19  The court noted that the courtroom is a public forum, and that the proceedings must be

20  transparent, and allowed the officers to attend.

21      The State points out that Hudson fails to even allege how many officers in full

22  uniform attended closing arguments. (ECF No. 22 at 17.)  They argue that he doesn't

23

1  allege, and the record doesn't show, any actions or intimidation by officers to intimidate

2  jurors.

3      The Nevada Court of Appeals addressed this claim in a footnote:

4          Hudson argues the district court erred by allowing "several" armed,
       uniformed officers to "pack" the courtroom during closing arguments.

5      However, "the mere presence of officers in the courtroom does not
       demonstrate prejudice." *Turner v. State*, 136 Nev. 545, 549 n.3, 473 P.3d

6      438, 444 n.3 (2020). Apart from Hudson's brief objection to the officers'
       presence below there is nothing else to suggest the number of officers

7      present nor that their presence had any impact on the proceedings.
       Therefore, the record is insufficient to determine the officers' presence

8      deprived Hudson of a fair trial. *See Johnson v. State*, 113 Nev. 772, 776,
       942 P.2d 167, 170 (1997) ("We cannot properly consider matters not

9      appearing in [the] record.").

10     (Exh. 90 at 20, n.9.)

11     While the defense objected before closing arguments, there is simply nothing in

12 the record to indicate how many officers were actually in the courtroom for closing

13 arguments.  And there is nothing to indicate any action or inaction by any officers or any

14 impact of their presence on the jury.  Hudson cannot demonstrate that the Nevada

15 Court of Appeals' refusal to consider the claim because the record was insufficient was

16 contrary to, or involved an unreasonable application of, clearly established U.S.

17 Supreme Court law, or was based on an unreasonable determination of the facts in light

18 of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).  Habeas

19 relief is denied as to ground 4.

20     **Ground 6**

21     Hudson argues that the district court abused its discretion by failing to find that

22 his trial counsel was ineffective for failing to object to the jury instruction regarding flight.

23 (ECF No. 5.)  The State counters that Hudson failed to show he suffered prejudice

1  because the court issued the flight instruction without an instruction limiting it to Turner.

2  (ECF No. 22 at 21.)  So they argue that this claim that counsel was ineffective

3  necessarily fails.

4        Ineffective assistance of counsel ("IAC") claims are governed by the two-part test

5  announced in *Strickland v. Washington*, 466 U.S. 668 (1984).  In *Strickland*, the

6  Supreme Court held that a petitioner claiming ineffective assistance of counsel has the

7  burden of demonstrating that (1) the attorney made errors so serious that he or she was

8  not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) that the

9  deficient performance prejudiced the defense. *Williams*, 529 U.S. at 390-91 (citing

10  *Strickland*, 466 U.S. at 687).  To establish ineffectiveness, the defendant must show

11  that counsel's representation fell below an objective standard of reasonableness. *Id*.  To

12  establish prejudice, the defendant must show that there is a reasonable probability that,

13  but for counsel's unprofessional errors, the result of the proceeding would have been

14  different. *Id*.  A reasonable probability is "probability sufficient to undermine confidence

15  in the outcome." *Id*.  Additionally, any review of the attorney's performance must be

16  "highly deferential" and must adopt counsel's perspective at the time of the challenged

17  conduct, in order to avoid the distorting effects of hindsight. *Strickland*, 466 U.S. at 689.

18  It is the petitioner's burden to overcome the presumption that counsel's actions might be

19  considered sound trial strategy. *Id*.

20      Ineffective assistance of counsel under *Strickland* requires a showing of deficient

21  performance of counsel resulting in prejudice, "with performance being measured

22  against an objective standard of reasonableness, . . . under prevailing professional

23  norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations and citations

omitted).  When the ineffective assistance of counsel claim is based on a challenge to a

guilty plea, the *Strickland* prejudice prong requires a petitioner to demonstrate "that

there is a reasonable probability that, but for counsel's errors, he would not have

pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52,

59 (1985).

If the state court has already rejected an ineffective assistance claim, a federal

habeas court may only grant relief if that decision was contrary to, or an unreasonable

application of, the *Strickland* standard. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).

There is a strong presumption that counsel's conduct falls within the wide range of

reasonable professional assistance. *Id*.

The United States Supreme Court has described federal review of a state supreme

court's decision on a claim of ineffective assistance of counsel as "doubly deferential."

*Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

The Supreme Court emphasized that: "We take a 'highly deferential' look at counsel's

performance . . . through the 'deferential lens of § 2254(d).'" *Id.* (internal citations

omitted).  Moreover, federal habeas review of an ineffective assistance of counsel claim

is limited to the record before the state court that adjudicated the claim on the merits.

*Cullen*, 563 U.S. at 181-84.  The United States Supreme Court has specifically

reaffirmed the extensive deference owed to a state court's decision regarding claims of

ineffective assistance of counsel:

> Establishing that a state court's application of *Strickland* was
> unreasonable under § 2254(d) is all the more difficult. The standards
> created by *Strickland* and § 2254(d) are both "highly deferential," *id.* at
> 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct.
> 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review
> is "doubly" so, *Knowles*, 556 U.S. at 123. The *Strickland* standard is a
> general one, so the range of reasonable applications is substantial. 556
> U.S. at 124. Federal habeas courts must guard against the danger of

equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 562 U.S. at 105. "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id*. at 104 (quoting *Strickland*, 466 U.S. at 689). "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id*. (internal quotations and citations omitted).

Here, the Nevada Court of Appeals held that, even assuming arguendo that giving the flight instruction without a limiting instruction was error,

> Hudson has failed to demonstrate that the error affected his substantial rights. He has likewise failed to demonstrate that any failure to object to the instruction prejudiced him for purposes of his ineffective assistance of counsel claim. *See* [*Strickland v. Washington,* 466 U.S. 668, 705]. Hudson has not pointed to anything in the record that might suggest the jury mistakenly applied the flight instruction to him, and the jury could not have done so because there was no "going away" on Hudson's part that might have been misinterpreted as flight. As such, Hudson has not demonstrated "there is a reasonable probability that the verdict would have been different" but for counsel's failure to object to the flight instruction. *Id*. We need only determine that Hudson has failed as to at least one of the prongs of his ineffective assistance of counsel claim to dispose of it. *Id*. Because Hudson has failed to demonstrate prejudice, we cannot conclude that the district court abused its discretion in finding that Hudson had not received ineffective assistance of counsel based on his counsel's failure to object to the flight instruction.

(Exh. 90 at 21-22.)

Hudson has not demonstrated that any error in not limiting the flight instruction to Turner violated due process. His argument that he was prejudiced by his counsel failing to object to the omission when the instruction very clearly did not apply to him belies common sense. Hudson has not shown that the Nevada Court of Appeals' decision on

1    federal ground 6 was contrary to, or involved an unreasonable application of, *Strickland*,

2    or was based on an unreasonable determination of the facts in light of the evidence

3    presented in the state court proceeding. 28 U.S.C. § 2254(d).  The Court denies habeas

4    relief on ground 6.

5        **Ground 5**

6        Hudson contends that cumulative error in trial proceedings violated his

7    constitutional rights. The Ninth Circuit has held that the combined effect of multiple trial

8    court errors violates due process where it renders the resulting criminal trial

9    fundamentally unfair. *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007), citing

10   *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973).  The cumulative effect of multiple

11   errors can violate due process even where no single error rises to the level of a

12   constitutional violation or would independently warrant reversal. *Chambers*, 410 U.S. at

13   290 n.3.  The fundamental question in determining whether the combined effect of trial

14   errors violated a defendant's due process rights is whether the errors rendered the

15   criminal defense "far less persuasive," and thereby had a "substantial and injurious

16   effect or influence" on the jury's verdict. *Parle*, 505 F.3d at 928 (citing *Chambers*, 410

17   U.S. at 294); *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

18       The Nevada Court of Appeals held that the two instances of prosecutorial

19   misconduct did not warrant reversal of Hudson's conviction:

20           Even if every error below fails to provide grounds for reversal alone,
         the cumulative effect of those errors may provide such grounds.
21       *Hernandez v. State*, 118 Nev. 513, 535, 50 P.3d 1100, 1115 (2002). When
         reviewing a cumulative error claim, this court looks to three factors: "(1)
22       whether the issue of guilt is close, (2) the quantity and character of the
         error, and (3) the gravity of the crime charged." *Mulder v. State*, 116 Nev.
23       1, 17, 992 P.2d 845, 854-55 (2000). Here, as to the first *Mulder* factor, the
         prosecution presented substantial evidence of Hudson's guilt including his
         DNA on the shotgun, and his own confession to having gone to Clarkson's

house to steal marijuana and to shooting the shotgun at the house. We also note Hudson was charged under alternative theories of liability including aiding or abetting Turner and conspiring with Turner. As to the second factor, two errors occurred during Hudson's trial. Each was an incident of prosecutorial misconduct. Although troubling, these two instances of misconduct were brief comments made near the end of a ten-day trial, and they do not warrant the reversal of Hudson's conviction considering the strong evidence that otherwise implicated him, even considering the gravity of the crimes of which he was convicted, under the third *Mulder* factor. Therefore, we decline to reverse Hudson's conviction based on the two instances of prosecutorial misconduct.

(Exh. 90 at 19-20.)

Considering the extensive evidence presented, including Hudson's statements that he went to the house to steal marijuana and that he fired the shotgun, and that his DNA was on the shotgun, the Court of Appeals reasonably concluded that two brief instances of prosecutorial misconduct during closing arguments, even assessed cumulatively, did not warrant reversal of his conviction.  This Court agrees Hudson has not shown that the Nevada Court of Appeals' decision on federal ground 5 was contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court law, or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).  The Court denies habeas relief on ground 5.

The Petition, therefore, is denied in its entirety.

## IV.    Certificate of Appealability

This is a final order adverse to the Petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a Certificate of Appealability (COA).  Accordingly, the court has *sua sponte* evaluated the claims within

1    the Petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v.*

2    *Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

3        Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has

4    made a substantial showing of the denial of a constitutional right."  With respect to

5    claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists

6    would find the district court's assessment of the constitutional claims debatable or

7    wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463

8    U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable

9    jurists could debate (1) whether the petition states a valid claim of the denial of a

10   constitutional right and (2) whether the court's procedural ruling was correct. *Id*.

11       Having reviewed its determinations and rulings in adjudicating Hudson's petition, the

12   court finds that none of those rulings meets the *Slack* standard.  The Court therefore

13   declines to issue a certificate of appealability for its resolution of Hudson's Petition.

14   **V.    Conclusion**

15   It is therefore ordered that the Petition (ECF No. 5) is **DENIED**.

16   It is further ordered that a Certificate of Appealability will not issue.

17   The Clerk of the Court is directed to:

18       •   Substitute Ronald Oliver for Respondent William Hutchings; and

19       •   Enter judgment accordingly and close this case.

20       DATED: 24 June 2025.

21

22                                 GLORIA M. NAVARRO

23                                 UNITED STATES DISTRICT JUDGE